**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 3:21-CR-141-006 |
| | ) |
| YANAL KHRISAT, | ) |
| | ) |
| *Defendant.* | ) |

**UNITED STATES' POSITION ON SENTENCING**

The United States of America, through undersigned counsel, submits the following position regarding the sentencing of defendant YANAL KHRISAT. The United States has no objections to the Presentence Report (Dkt. 150) and concurs with its calculation of a Sentencing Guidelines range of 27-33 months' imprisonment. As explained below, the Court should impose a sentence at the low end of the applicable Guideline range. Such a sentence is sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

**Discussion**

During sentencing, federal courts must follow a multistep process that analyzes both procedural and substantive concerns. First, the court must correctly calculate the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Second, "the court must determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011) (internal quotation marks omitted). To the extent the Court deems some deviation from the Guidelines range appropriate, the Court must

give serious consideration to the extent of the deviation and must adequately explain it "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 365 (internal quotation marks omitted). In all events, the Court must impose a sentence that takes into consideration the factors listed under 18 U.S.C. § 3553(a). *See id.* at 364.

I. **THE PRESENTENCE REPORT CORRECTLY CALCULATES THE APPLICABLE GUIDELINES RANGE.**

The United States has no objections to the Presentence Report (PSR). The PSR correctly calculates a base offense level of 7 and a 10-level enhancement for a loss amount of more than $150,000. PSR ¶¶ 36-37. In addition, the PSR includes three specific offense characteristics enhancements. *First*, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), the defendant's offense level is increased by two levels because the offense involved 10 or more victims. *Id.* ¶¶ 24, 38. *Second*, pursuant to U.S.S.G § 2B1.1(b)(11)(C)(ii), the defendant's offense level is increased by two levels because the offense involved the possession of five or more means of identification that were unlawfully produced from another means of identification. *Id.* ¶ 39. *Third*, pursuant to U.S.S.G. § 2B1.1(b)(18), the defendant's offense level is increased by two levels because he was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information. *Id.* ¶ 40. KHRISAT received a two-level reduction for his minor role in the offense. *Id.* ¶ 42. As a result, the PSR calculates a total offense level of 18 (after a 3-level reduction for acceptance of responsibility[1]). With a criminal history category of I, the defendant's advisory Guidelines range is 27-33 months' imprisonment.

---

[1] By separate filing, the United States moves the Court for an additional reduction to the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b).

## II. THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553 SUPPORT A LOW-END GUIDELINE RANGE SENTENCE.

Under 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in § 3553(a)(2). Specifically, the Court's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Section 3553(a) further "provides that in determining a particular sentence, a sentencing court must consider seven enumerated *factors*," *United States v. Shortt*, 485 F.3d 243, 247 (4th Cir. 2007) (emphasis in original), including the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines, any pertinent policy statements, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense, 18 U.S.C. § 3553(a)(1), (3)-(7).

"The sentencing *purposes* identified in § 3553(a)(2)(A) [through] (D) are the four foundational purposes of sentencing that have long prevailed throughout [American] jurisprudence—(1) punishment, (2) deterrence, (3) incapacitation, and (4) rehabilitation." *Shortt*, 485 F.3d at 248-49 (citing Ilene H. Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines*, 80 J. Crim. L. & Criminology 883 (1990)) (emphasis in original). "[M]ost of the specified purposes [of sentencing] listed in [§ 3553(a)(2)] hardly connote less punishment." *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir.

2006). Indeed, the first three—respect for the law, just punishment, deterrence, and protection of the public—"certainly do not suggest leniency; only one listed purpose," rehabilitation, "has a softer tone." *Id.* at 58 n.3 (citing 18 U.S.C. § 3553(a)(2)). And, "[a]lthough still relevant," Congress and the Sentencing Commission have recognized that "th[is] fourth purpose … [is] insufficient, standing on its own, to justify a particular sentence." *Shortt*, 485 F.3d at 249 (citing S. Rep. No. 98-225, at 38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221). Instead, the Senate Committee responsible for drafting the Sentencing Reform Act of 1984 "placed special emphasis on the first stated purpose—the need 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.* (citing S. Rep. No. 98-225 at 75). "As it observed, the first purpose 'should be reflected clearly in *all* sentences." *Id.* (emphasis in *Shortt*).

A sentence that fails to serve the purposes of sentencing outlined in § 3553(a)(2) is just as unreasonable as one that is greater than necessary to serve such purposes. *United States v. Dowell*, 771 F.3d 162, 176 (4th Cir. 2014) (quoting *Shortt*, 485 F.3d at 248).

### A. Nature and Circumstances of the Offense

On December 7, 2021, KHRISAT and five codefendants were named in an eighteen-count Indictment. PSR ¶ 1. On April 13, 2022, KHRISAT pled guilty to Counts One, Three, and Six of the Indictment for Conspiracy to Commit Wire and Bank Fraud, in violation of 18 U.S.C. § 1349; Accessing a Protected Computer in Furtherance of Fraud, in violation of 18 U.S.C. §§ 1030(a)(4), (c)(3)(A), and 2; and Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2. *Id.* ¶¶ 2-4, 7.

### 1.   *General Background.*

For more than five years, defendants conspired to defraud at least a half dozen financial service providers through various and escalating means. First, conspirators applied to designate businesses that they and their family members owned as partner retailers, a designation that allowed those businesses to offer their customers retail financing through the targeted providers. Instead, conspirators used hundreds of stolen identities to obtain lease and credit card accounts to which they then charged thousands of dollars for purchases that did not actually occur, causing the targeted to providers to pay them hundreds of thousands of dollars they were not actually owed. To further defraud these providers, conspirators also created fictitious businesses ostensibly owned and operated by themselves and other people. These sham companies conducted no legitimate business and, instead, were used solely to induce the targeted providers to continue paying conspirators for retail purchases that never occurred.

As the scheme progressed, conspirators further targeted providers through computer intrusions in which they used social engineering to gain access to other businesses' accounts and then diverted payments intended for those businesses to themselves. In addition to compromising accounts belonging to existing businesses, conspirators also assumed the identities of shuttered businesses in several states. As they did with their own businesses and the fake businesses created to further the scheme, conspirators applied to designate the shuttered businesses as partner retailers and, once approved, applied for and expended financing in the names of stolen identities.

Through this conduct, defendants used more than 1,000 stolen identities to defraud and attempt to defraud at least six financial service providers of at least $2.3 million in just under five years.

### 2. *KHRISAT's Role in the Offense.*

Like many of his co-conspirators, KHRISAT incorporated a furniture company in Chicago, Illinois that fraudulently obtained funds by submitted financing applications in the name of identity theft victims without those individuals' knowledge or consent. PSR ¶¶ 17.18, 17.26. Specifically, Secretary of State records reflect that KHRISAT was the registered agent of BB&K Wholesale Corp., and he opened and maintained a Fifth Third Bank account in the name of BB&K where he was the sole authorized signatory. *Id.* ¶ 17.26. KHRISAT also opened and maintained a BMO Harris Bank account in the name of Glamour Home Furnishings where he was the sole authorized signatory. *Id.* ¶ 20. Unlike many of his co-conspirators, none of the furniture companies registered to KHRISAT ever had any legitimate business, rather they operated solely as conduits for fraud proceeds associated with the present offense.

In February 2018, KHRISAT and his co-conspirators fraudulently obtained at least $138,928.19 from West Creek Financial as a result of approximately 60 deposits for furniture purchases from Bernie & Phyl's, $83,459.08 of which went into the BB&K Fifth Third account controlled by KHRISAT. *Id.* ¶¶ 17.27-28. The conspirators were able to fraudulently access funds intended for Bernie & Phyl's because one of the co-conspirators (not KHRISAT) accessed the Bernie & Phyl's partner retailer/dealer account through social engineering and submitted leases for funding unrelated to any business owned by the conspirators and falsely represented that Bernie & Phyl's had delivered the subject items. *Id*. ¶¶ 17.24-25, 17.27-29. As the sole signatory of the BB&K Fifth Third account, KHRISAT disbursed the funds to himself and various co-conspirators. *Id*. ¶ 17.28. KHRISAT did not, however, receive any of the funds disbursed to the Xclusive Furniture account owned by co-defendant M. ALJIBAWI. *Id.*

In December 2021, KHRISAT and co-conspirator W. JIBAWI fraudulently obtained at least $96,979.93 from Kafene Inc. as a result of point-of-sale financing in the name of shuttered business "Furniture Kingdom" from Gainesville, Florida. *Id.* ¶¶ 19-20. The conspirators directed these funds to the BMO Harris Bank account in the name of Glamour Home Furnishings, of which KHRISAT was the sole signatory. *Id.* Kafene determined that the accounts receiving the funds were actually the conspirators, who had assumed the identities of recently closed businesses and were operating under the closed businesses' credentials and submitting fraudulent applications in the name of identity theft victims. *Id.* As the sole signatory of the Glamour Home Furnishings BMO Harris account, KHRISAT disbursed some of the Kafene funds to himself, but the majority to his co-conspirator W. JIBAWI. *Id.*

Understanding the nature of the scheme, the amount of money involved, and the manner in which conspirators repeatedly profited using the names and identities of unwitting victims, KHRISAT had to know that he and his co-conspirators were causing substantial hardship to their victims. To date, over 1,000 identity theft victims have been identified, along with the six financing companies defrauded. *Id.* ¶ 24. In total, between the West Creek intrusion and the Glamour Home Furnishings Kafene fraud, KHRISAT caused an actual loss to the financing companies of $235,908.12, and received approximately $69,555.63, less than any of the other co-conspirators.

In mitigation, the defendant's conduct is isolated to these two comparatively smaller fraud schemes, and he quickly accepted responsibility in this case after being indicted, conserving judicial and prosecutorial resources. Further, the defendant has agreed to forfeit approximately $70,000 in fraud proceeds, as set forth in the forthcoming Amended Consent Order of Forfeiture. A sentence of imprisonment at the low end of the Guidelines balances the

mitigating circumstances of the defendant's limited involvement and quick acceptance of responsibility with the other statutory sentencing factors.

### B. History and Characteristics of the Defendant

Nothing in KHRISAT's background explains or mitigates his involvement in the instant offense. He and his three siblings were raised by their parents first in Jordan, and then in Burbank, Illinois in a tightknit family that still lives together. PSR ¶¶ 56-59. KHRISAT reported that he obtained an Associate Degree from Moraine Valley Community College, and attended some pre-med classes at St. Xavier College, and opened a purportedly legitimate furniture business of his own in June 2021. *Id*. ¶¶ 65-69.

A mature adult, KHRISAT joined this scheme in his mid-twenties. KHRISAT has no known criminal history prior to this offense, and no further contact with law enforcement since the instant offense. PSR ¶¶ 49-55. KHRISAT suffers from a medical condition causing pain and occasional difficulty walking and laying down, but he is receiving medical care for the condition. *Id.* ¶ 61. KHRISAT has no record of problems regarding substance abuse or significant mental or emotional health issues. *Id.* ¶¶ 63-64.

### C. Seriousness of the Offense

The scope of fraud perpetrated against identity theft victims is truly enormous. According to the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, in 2018 alone, an estimated 23 million people (9% of all U.S. residents aged 16 and older) reported they were victims of identity theft in the prior 12 months.[2] For victims with a

---

[2] Erika Harrell, *Victims of Identity Theft, 2018*, April 2021, https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (hereinafter "BJS Report").

known loss of $1 or more, their financial losses totaled $15.1 billion. *Id*. The defendants' extensive fraud scheme victimized over 1,000 people in whose names the defendants opened new financing accounts or credit cards without their authorization. PSR ¶ 24.

Being the victim of identity theft is truly a life altering experience even if one does not suffer any quantifiable monetary loss. In addition to potential financial harm, many victims of identity theft suffer devastating emotional trauma from these crimes, resulting in feelings of anger, fear, anxiety, depression, confusion, and more as outlined in the Victim Impact Statements[3] attached to the PSR (Dkt. 150-1). Indeed, the Bureau of Justice Statistics estimates that about 50% of identity theft victims in whose name a new account was opened experience moderate or severe distress as a result of the crime. BJS Report at 11. The victims in this case also repeatedly identify the toll that this crime had—and in some instances continues to have—on their quality of life and that of their families, such as low credit impacting available housing options (Pages 64, 75-77), struggling to regain financial independence (Page 80), and struggling to get other forms of financial assistance due to low credit scores (Page 67).

In addition to the emotional toll, and detriment to their quality of life, victims of identity theft—especially those who are victimized by fraudsters opening new accounts in their names— routinely spend significant amounts of time resolving associated financial and credit problems. Victims of identity theft are advised to follow a litany of time-consuming measures to protect themselves including: placing a fraud alert with the credit reporting agencies,

---

[3] It was discovered today that the Victim Impact Statements attached to the six defendants' PSRs are not all in the same order. M. ALJIBAWI and A. ALJIBAWI are in the order referenced in the Government's Positions on Sentencing filed October 4, 2022, but M. JIBAWI, W. JIBAWI, ELJEBAWE, and KHRISAT's Victim Impact Statements are in a different order. The Government will provide corrected Victim Impact Statement citations for ELJEBAWE and M. JIBAWI reflecting the different order of the statements.

creating an identity theft file, investigating their legal rights, reporting the identity theft to law enforcement and the Federal Trade Commission, placing a credit freeze, ordering and reviewing credit reports and disputing charges, contacting the Internal Revenue Service, contacting the Social Security Administration, and investigating potential civil remedies.[4]

The Bureau of Justice Statistics estimates that these types of identity theft victims spend an average of 14 hours resolving these issues, with some taking as long as over six months to reach a resolution. BJS Report at 12. The Victim Impact Statements detail the exorbitant amount of time spent victims spent reporting these offenses to police, credit bureaus, creditors, etc. in attempts to clear their names, as well as various other remediation steps they had to take to unwind the harm of the fraud and secure their identity from future fraud, such as closing accounts (Pages 8, 13, 73).

In addition to the defendants' identity theft victims, six financial institutions were victimized by the defendants' fraud conspiracy, including two that were specifically defrauded by KHRISAT. PSR ¶¶ 22-24. The financing companies defrauded by KHRISAT paid out approximately $236,000 for fraudulent financing applications. *Id*. In addition to funding the fraudulent applications, the financing companies were further harmed by the significant business interruption and financial expenditures associated with the investigation into the fraudulent conduct, a harm that can never fully be quantified. *See, e.g.*, West Creek Victim Impact Statement (Dkt. 150-1 at 88-89).

---

[4] *Taking Action: Identity Theft Victim Recovery Checklist*, National Center for Victims of Crime, https://victimsofcrime.org/wp-content/uploads/2020/08/FINRA-Taking-Action-Checklist-Identity-Theft-final.pdf.

Although the defendants have all agreed to restitution and forfeiture, based on the financial information included in the PSR, it is unlikely that KHRISAT and/or his co-conspirators will ever be able to make the financial institutions whole for the losses they suffered. PSR ¶ 72 (reflecting a negative monthly cash flow). Put simply, when financial service providers suffer frauds of these magnitudes, it necessarily raises the cost of borrowing for everyone.

There can be no dispute that the defendant's offense of conviction is a serious one. And while his involvement in the conspiracy was less than the ringleader, a sentence of imprisonment at the low end of the Guidelines is required to adequately punish his conduct.

### D. Need to Deter Future Criminal Conduct and Promote Respect for the Law

A sentence within the applicable guideline range will also achieve the goals of specific and general deterrence while also promoting respect for the law.

KHRISAT repeatedly and knowingly participated in a crime that had significant consequences for hundreds of identity theft victims, as well as financial institutions that provide much needed financing for underprivileged populations that otherwise would be unable to afford large purchases. KHRISAT understood that the fraudulent funds received were the result of bogus financing fraud applications in the name of unwitting identity theft victims. As the account holder and sole signatory of at least one business bank accounts used to perpetrate these frauds, KHRISAT knew that he had not sold any of the items purportedly purchased with that financing, as none of the bank accounts corresponded to an actual legitimate furniture business. A Guideline range sentence of imprisonment will provide sufficient deterrence from future criminal conduct by this defendant.

The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). Absent a term of imprisonment available to punish participation in fraudulent schemes using the stolen identities of others, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). Further, "because economic and fraud-based crimes are 'more rational, cool and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Additionally, given the prevalence of identity theft, and the steep and unquantifiable harm, emotional trauma, and stress suffered by those who have had their personal identifying information compromised and used to satisfy the greed of fraudsters, general deterrence is particularly apt in cases such as KHRISAT's.

A sentence of imprisonment at the low end of the Guidelines is necessary to send the appropriate message to both KHRISAT and others that those who engage in this conduct will be caught and punished significantly.

### E.   Need to Protect the Public from the Defendant's Future Criminal Conduct

A mature adult with no prior criminal history, KHRISAT joined a broad and enduring conspiracy to defraud multiple financing companies of millions of dollars. In his case, past was not prologue—his years of abiding the law did little to protect the public from the crimes he

ultimately committed. Therefore, a guideline range sentence is needed to provide adequate protection to the public from future criminal conduct by the defendant.

### F. Substance Abuse and Mental Health Treatment or Vocational Training

As noted above, the defendant has no known treatment needs.

### G. Need to Avoid Unwarranted Sentencing Disparities

There is no compelling reason to treat KHRISAT differently from those who have engaged in comparable criminal conduct. His offense fits squarely within the recommended Guidelines range.

## CONCLUSION

For the reasons discussed above, the United States respectfully requests that the Court impose a sentence of imprisonment of 27 months, at the low end of the applicable Guideline range.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:  /s/  Carla Jordan-Detamore
Carla Jordan-Detamore
Virginia Bar No. 85934
Kaitlin G. Cooke
Virginia Bar No. 83935
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street
Suite 1900
Richmond, VA 23219
Ph: (804) 819-5400
Fax: (804) 771-2316
Email: Kaitlin.Cooke@usdoj.gov
carla.jordan-detamore@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, I electronically filed the foregoing position with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

I also hereby certify that on October 5, 2022, I emailed a true and accurate copy of this Position on Sentencing to the following:

Diane DeLuca
United States Probation Officer
Suite 1150
701 East Broad Street
Richmond, Virginia 23219

By:    /s/ *Carla Jordan-Detamore*
Carla Jordan-Detamore
VA Bar No. 85934
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: Carla.jordan-detamore@usdoj.gov